## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:     **MOUSSA SACKO**          :        **Chapter 13**
                                     :
           **Debtor(s)**             :
                                     :        **Bky. No. 07-11239ELF**

# O P I N I O N

### I.  INTRODUCTION

Moussa Sacko ("the Debtor") filed this chapter 13 bankruptcy case on March 2, 2007.  In his chapter 13 plan, he proposes to cure a prepetition delinquency on his residential mortgage.[1]  The holder of the mortgage is Aurora Loan Services ("Aurora").

Presently at issue is the amount of the prepetition arrears on the Aurora mortgage ("the Mortgage").  Aurora has filed a proof of claim asserting that the arrears total $19,363.69.  The Debtor has filed an objection to Aurora's proof of claim.

For the reasons explained below, I determine the arrears to be $11,660.79.

### II.  BACKGROUND

The Debtor is the owner of the real property located at 7234 Paschall Avenue, Philadelphia, PA 19142 ("the Property").  He purchased the Property in April 2005.  The financing for the purchase was provided by Aurora's predecessor-in-interest.  The Debtor granted

---

[1]     See Debtor's Second Amended Plan ¶3 (Docket Entry No. 91); see also 11 U.S.C. §1322(b)(5) (authorizing chapter 13 plans to cure prepetition defaults).

a mortgage to the lender in the transaction.

In September 2005, the Debtor left the United States to return to his native country, Guinea, to help care for his mother, who was ill at the time. While he was out of the country, he did not make any mortgage payments.

On January 24, 2006, Aurora filed a mortgage foreclosure action against the Debtor in the Court of Common Pleas, Philadelphia County ("the CP Court"), docketed at No. 3303 January Term 2006 ("the CP Action"). On June 8, 2006, Aurora obtained a default judgment in the CP Action. Aurora subsequently caused the Property to be sold at a sheriff's sale conducted on October 3, 2006 ("the 1st Sheriff's Sale").

On October 13, 2006, the Debtor filed a Motion to Set Aside Sheriff's Sale ("the Motion"). In the Motion, the Debtor asserted that he had been given false assurances that Aurora would enter into a forbearance agreement that lulled him into permitting the sale to take place. Based on these allegations, he appealed to the equitable power of the CP Court to set aside the sale. See Exhibit D-4, at ¶¶6-12. On November 14, 2006, the CP Court granted the Motion. The CP Court did not issue an opinion explaining the reasons for its decision.

Thereafter, based on its default mortgage foreclosure judgment, the validity of which was not affected by the Order setting aside the 1st Sheriff's Sale, Aurora scheduled another sheriff's sale ("the 2nd Sheriff's Sale") for March 6, 2007. The 2nd Sheriff's Sale was stayed by the filing of this bankruptcy case on March 2, 2007.

### III.  PROCEDURAL HISTORY

On August 6, 2007, the Debtor filed a Proof of Claim on behalf of Aurora, see Fed. R. Bankr. P. 3004, asserting a secured claim of $50,000.00 with $5,000.00 in prepetition arrearages. See Exhibit D-2 (hereinafter "the Debtor's Proof of Claim").   The Debtor's Proof of Claim was docketed on the Claims Register as Claim No. 7.

On August 23, 2007, Aurora, acting through its servicing agent Mortgage Electronic Registration Systems, Inc. ("MERS"), filed a proof of claim (docketed on the Claims Register as Claim No. 8), asserting a secured claim of $51,766.11 with $19,363.69 in prepetition arrears. Attached to Claim No. 8 were documents titled "Fixed/Adjustable Rate Note" ("the Note") and "Mortgage."  Five (5) days later, on August 28, 2007, again acting through MERS, Aurora: (1) withdrew Claim No. 8 and (2) filed another proof of claim that it designated as an amendment to the Debtor's Proof of Claim ("the Amended Claim").  See Exhibit D-3.  The Amended Claim is designated as Claim No. 7-2 on the Claims Register. In content, the Amended Claim was identical to the withdrawn Claim No. 8, except that it did not include the Note and Mortgage as attachments.

The Debtor filed an Objection to the Amended Claim on September 7, 2007 ("the Objection") (Docket Entry No. 60).   In the Objection, the Debtor requested that the entire claim for arrears be stricken.

The hearing on the Objection was initially scheduled for October 23, 2007.  That hearing and the next five (5) hearings scheduled were continued by agreement of the parties.  On March 31, 2008, the hearing on the Objection was held and concluded.  At that hearing, the Debtor testified in support of the Objection and both parties offered several documents that were

admitted into evidence.

## IV.  THE CLAIM FOR ARREARS AND THE OBJECTION

Aurora attached to the Amended Claim the following itemization of its claim for

prepetition mortgage arrears:

| | |
|---|---|
| 19 Monthly Payments at $409.62 | $ 7,782.78 |
| Late charges | 159.25 |
| Escrow/Impound Advance | 1,682.89 |
| Property Inspections | 144.00 |
| Appraisals/Preservation | 270.00 |
| Property Preservation | 194.28 |
| Foreclosure Attorney Fees | 1,550.00 |
| Foreclosure Attorney Costs | 7,580.49 |
| **TOTAL** | **$19,363.69** |

In the Objection, the Debtor disputed the entire $19,363.69 in asserted arrears.

Specifically, the Debtor disputed whether "all payments made were properly credited" and

alleged that the remaining charges listed were "not clearly itemized, unclear and appear

excessive."  Debtor's Objection to Proof of Claim ¶¶ 3,4.

## V.  THRESHOLD ISSUE:  TIMELINESS OF THE AMENDED CLAIM

Fed. R. Bankr. P. 3002(c) provides that a proof of claim in a chapter 13 case is timely "if it is filed not later than 90 days after the first date set for the meeting of creditors called under §341(a) of the Code."  In this case, that deadline expired on August 14, 2007, two (2) weeks before Aurora filed the Amended Claim.

Prior to the commencement of the evidentiary portion of the hearing on the Objection, the Debtor asserted that the Amended Claim should be disallowed as untimely under Fed. R. Bankr. P. 3002(c).  Presumably, the Debtor believes that the disallowance of the Amended Claim as untimely filed would restore the vitality of the Debtor's Proof of Claim.[2]

Before receiving evidence on the Objection, I rejected the Debtor's argument.  Below, I briefly explain my reasons.

A number of courts have held that they have the discretion to allow a creditor to amend a claim a debtor has filed on the creditor's behalf under Fed. R. Bankr. P. 3004, even after the

---

[2]    Neither party acknowledges or addresses the fact that the claim the Debtor filed on Aurora's behalf was also "untimely," albeit in the sense of being "premature" rather than "late."  Rule 3004 authorizes the Debtor to file a claim on behalf of a creditor "within 30 days after the expiration of the time for filing claims prescribed by . . . Rule 3002(c)."  Fed. R. Bankr. P. 3004 (emphasis added).  See also 11 U.S.C. §501(b) (authorizing debtor to file proof of claim for creditor "[i]f a creditor does not timely file a proof of such creditor's claim") (emphasis added). Here, the Debtor filed the Proof of Claim on Aurora's behalf before the expiration of Aurora's deadline under Rule 3002(c).  Query whether it is subject to objection for that reason? If so, and if, as the Debtor asserts, no claim may now be filed on Aurora's behalf under the Rules of Court, how is it possible for the Debtor's chapter 13 plan to "provide for" Aurora under 11 U.S.C. §1322(b)(5)?  See generally In re Be-Mac Transport Co., Inc., 83 F.3d 1020, 1025 (8th Cir. 1996) (stating well-established principles that a lien generally passes through a bankruptcy proceeding unaffected and a secured creditor need not file a claim in a bankruptcy proceeding to preserve its lien).  In any event, Aurora has not asserted that the claim filed by the Debtor should be disallowed as untimely, but only that it is subject to amendment.

expiration of the deadline for the creditor to file a claim on its own behalf under Rule 3002(c).

See In re Kolstad, 928 F.2d 171 (5th Cir. 1991); In re McNichols, 255 B.R. 857 (Bankr. N.D. Ill.

2000); In re Bishop, 122 B.R. 96 (Bankr. E.D. Mo. 1990); see also In re Frascatore, 98 B.R. 710,

722 n.11 & 723 (Bankr. E.D. Pa. 1989) ("[A]s long as the creditor seeks to 'amend' the proof of

claim filed on its behalf within a reasonable time after it is filed, the creditor should be able to

attempt to supersede the claim filed on its behalf").[3]

I agree with the decisions cited above.  As Judge Sigmund concisely explained in dictum

in In re Hill, 286 B.R. 612, 620 (Bankr. E.D. Pa. 2002):

> Where a creditor who opts to remain outside the bankruptcy process is
> subsequently pulled in when the debtor files a proof of claim on its behalf, there
> must be some flexibility to mitigate the unfairness of binding the creditor to that
> filed claim because of the passage of the bar date.

In this case, after the Debtor filed a claim on Aurora's behalf, Aurora acted promptly to

assert its rights as a secured claimant.  The Debtor has suffered no prejudice due to Aurora's

failure to file its claim during the initial period provided by Rule 3002(c).  I will therefore, allow

Aurora to amend the claim the Debtor filed on its behalf.

---

[3]     The Advisory Committee Note to the 2005 amendment to Rule 3004 states:

> Providing the debtor and the trustee with the opportunity to file a claim
> ensures that the claim will participate in any distribution in the case. This
> is particularly important for claims that are nondischargeable.
>
> Since the debtor and trustee cannot file a proof of claim until after
> the creditor's time to file has expired, the rule no longer permits the
> creditor to file a proof of claim that will supersede the claim filed by the
> debtor or trustee. The rule leaves to the courts the issue of whether to
> permit subsequent amendment of such proof of claim.

## VI.  GENERAL PRINCIPLES GOVERNING THE BURDEN OF PROOF AND THE APPLICATION OF RULE 3001(f)

### A.  11 U.S.C. §502(a) and Fed. R. Bankr. P. 3001(f)

Allocation of the burden of proof in this proceeding requires consideration of 11 U.S.C. §502(a) and Fed. R. Bankr. P. 3001(f).

Section 502(a) provides that a filed proof of claim "is deemed allowed" unless a party in interest objects.  The Court of Appeals has summarized the parties' respective evidentiary burdens in a contested matter involving an objection to a proof of claim in the following oft-quoted passage:

> [A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) (citations omitted); accord In re Gimelson, 2004 WL 2713059, at *13 (E.D. Pa. Nov. 23, 2004); In re Galloway, 220 B.R. 236, 243-4 (Bankr. E.D. Pa. 1998); see also In re Patton, 388 B.R. 629, 633 (Bankr. E.D. Pa. 2008).

Notably, in the above-quoted passage, the Third Circuit cited the Ninth Circuit's discussion in In re Holm, 931 F.2d 620, 623 (9th Cir. 1991) which describes the burdens of proof this way:

> Inasmuch as Rule 3001(f) and section 502(a) provide that a claim or interest as to which proof is filed is "deemed allowed," the burden of initially going forward with the evidence as to the validity and the amount of the claim is that of the objector to the claim.  In short, the allegations of the proof of claim are taken as true.  If those allegations set forth all the necessary facts to establish a claim and are not self-

> contradictory, they prima facie establish the claim. Should objection
> be taken, the objector is then called upon to produce evidence and show
> facts tending to defeat the claim by probative force equal to that of the
> allegations of the proofs of claims themselves. But the ultimate burden
> of persuasion is always on the claimant. Thus, it may be said that the
> proof of claim is some evidence as to its validity and amount. It is
> strong enough to carry over a mere formal objection without more.

Id. (citations and internal emphasis omitted).

Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." If the evidentiary presumption provided by Rule 3001(f) applies, it remains in force even after an objection to a claim is filed. E.g., In re Kincaid, 388 B.R. 610, 613 (Bankr. E.D. Pa. 2008).

Further, that a claim is not prima facie valid on its face does not necessarily mean that it must be disallowed. See generally In re Kirkland, 379 B.R. 341, 344 (B.A.P. 10th Cir. 2007) (after collecting cases, adopting the "exclusive view" that a claim may only be disallowed for reasons set forth in 11 U.S.C. §502(b) and not for failure to comply with Rule 3001) (2-1 decision). It means only that "the burden of going forward and proving its claim by the preponderance of the evidence remains on the claimant." E.g., Kincaid, 388 B.R. at 614; see also In re Campbell, 336 B.R. 430, 432 (B.A.P. 9th Cir. 2005).

In short, if a proof of claim complies with the Rules of Court and is self-sustaining (i.e., it sets forth the facts necessary to state a claim and is not self-contradictory), it is prima facie valid and the objecting party has the burden of producing evidence to refute the claim.

## B. Principles for Allocating the Burden of Proof and Applying Rule 3001(f) in Contested Matters Involving Objections to Claims for Mortgage Arrears

Applying the burden of proof principles discussed above in contested matters involving objections to proofs of claim for mortgage arrears is not always a simple task. Proofs of claim

-8-

for prepetition mortgage arrears filed by the holders of residential mortgages frequently have

multiple itemized components.   These components may include the missed monthly payments,

late charges, a shortage in the escrow account and a host of different types of default and

collection expenses that may have been incurred prepetition, such as: attorney's fees, court filing

fees, sheriff's fees, property inspection charges, appraisal charges and property preservation

charges.  The validity of each of these separate components of the arrears may require

consideration of different facts or sources of legal authority.

> A threshold question is whether the objector's burden of production applies to the proof

of claim as a whole or whether it is applies separately in determining whether to allow or

disallow each itemized component of the claim.  For example, if a debtor submits evidence

rebutting the amount of missed monthly payments, does the burden of proof shift to the claimant

with respect to the remaining itemized components of the arrears claim (e.g., the amount claimed

for an escrow shortage)?

> Nor is it entirely clear how courts should apply Rule 3001(f) and its incorporation of the

Rule 3001(c) requirement that claimants attach to the proof of claim any writing on which the

claim is "based."  For example, because the claim of a creditor secured by the debtor's residence

is undoubtedly "based" on a note and a mortgage, at a minimum, one would expect those

documents to be attached to a proof of claim to satisfy Rule 3001(c) and trigger the evidentiary

presumption under Rule 3001(f).  But is attachment of the note and mortgage sufficient to make

out a prima facie case through Rule 3001(f) with respect to the myriad types of default and

collection charges that may be itemized in a proof of claim for prepetition arrears?  Are those

charges "based" solely on the note and mortgage as that term is used in Rule 3001(c)?  Or, are

they also "based" on other writings, such as the invoices sent to the creditor for each particular

charge?  In other words, if the mortgage and note are attached to a proof of claim for mortgage

arrears, is an allegation in the proof of claim that the creditor incurred certain expenses

referenced in those documents as being chargeable to the borrower (and even then, perhaps only

if certain conditions or requirements are satisfied) sufficient to satisfy Rule 3001(c) and thus,

permit the claimant to invoke Rule 3001(f)?  If so, given that the evidence relating to the charges

is under the claimant's control, how does the objector (usually, the debtor) develop and present

the refutation evidence necessary to overcome the claimant's prima facie case?  If attaching the

note and mortgage is sufficient, must the objector engage in formal discovery  – or at least

informal discovery  – to put forward evidence that contradicts the charges itemized in the proof

of claim or, at least, establish that the claimant has not produced evidence to corroborate its

entitlement to the charges?

       To answer these questions, it is helpful to step back and consider the overriding purpose

of the procedural rules governing the allowance of claims in bankruptcy cases  – to facilitate the

efficient, economical resolution of claims allowance disputes, without all of the formalities found

in a full-blown adversary proceeding.  As the court explained in In re Shank, 315 B.R. 799

(Bankr. N.D. Ga. 2004):

> The fundamental purpose of the claims allowance process and the various rules
> for filing of proofs of claim and allocating burdens of proof is to provide a fair and
> inexpensive procedure for the proper determination of claims on the merits. Those
> rules and procedures are not properly invoked with regard to a claim unless there is an
> actual or potential dispute about the debtor's liability vel non or its amount. The
> bankruptcy rules contemplate resolution of objections to claims as contested matters,
> not as adversary proceedings. Thus, they envision much simpler, expedited
> proceedings without all the trappings of normal civil litigation. They do not envision
> the determination of claims based on procedural technicalities such as whether a proof
> of claim includes adequate documentation or whether a creditor on 30 days notice
> may be "put to its proof" in the absence of any indication that there is, in fact, a bona
> fide controversy over the amount of the debt.

Id. at 814 (emphasis added); accord In re Kincaid, 388 B.R. at 618 (in claims allowance process,

-10-

"[c]reditors are not given leave to file proofs of claim with little or no documentation nor are

debtors encouraged to object to claims they admittedly owe based on perceived evidentiary

advantages").[4]

To facilitate the goal of simplifying the claims allowance dispute resolution process, Rule

3001(f) permits a creditor to provide the initial evidentiary support for its claim and make out its

prima facie case by attaching supporting documentation to the proof of claim without the need to

meet all of the formal requirements of the rules of evidence (for example, Fed. R. Evid. 803(6)).

See In re Cluff, 313 B.R. 323, 332 (Bankr. D. Utah 2004).  In effect, "Rule 3001(f) . . . permit[s]

the proof of claim itself to act similar to a verified complaint and have an independent

evidentiary effect."  In re Heath, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005).

I have considered the underlying purposes of the rules governing the claims allowance

process in answering the questions that I posed above.

First, to the extent that a claim for mortgage arrears includes different components with

different sources of proof, each component should be analyzed separately when applying the

burden of proof principles articulated in Rule 3001(f) and In re Allegheny Int'l, Inc.  This

approach equitably balances the burdens and costs of the claimant and objector by permitting the

claimant to avoid the cost of attaching documentation with respect to components of the claim as

to which there may not be any bona fide dispute.  For example, I see no benefit in compelling a

claimant who is asserting a claim for mortgage arrears to generate supporting documentation of

its disbursements for taxes (at the risk of failing to make out its prima facie case) simply because

the objector has questioned whether the asserted attorney's fees claimed were reasonable or

---

[4]      Proof of claim litigation may also be complex and render more summary
procedures inappropriate.  In such cases, the bankruptcy court can always fashion its pretrial
management orders to incorporate more formal and traditional procedures from the rules
governing adversary proceedings.  See Fed. R. Bankr. P. 9014(c).

actually incurred.  See generally In re Patton, 388 B.R. 629, 635 (Bankr. E.D. Pa. 2008)

(criticizing objector strategy of asserting "vague and generalized claim objections which rely for

their success on the reluctance of creditors to spend the time and money to present witnesses to

establish their claims"); In re Kincaid, 388 B.R. at 618 ("Objections under Rule 3001 . . .  are not

[to be] used to frustrate creditors or waste time").  At the same time, as explained below, the

good faith objector may demand documentation of any component of the claim that it questions

in good faith.

Second, Rule 3001(c)'s requirement that a claimant attach the writing on which a claim is

"based" need not be read expansively to encompass all of the relevant documents that might be

produced in ordinary civil litigation to support the claimant's entitlement to each component of

the mortgage arrears claim.  Compelling claimants to attach detailed records supporting the

various parts of the claim before an objection is filed will be unnecessary in many cases and

would result in increased expense to the claimant without any obvious commensurate benefit to

the bankruptcy system for claims allowance and disallowance.  It appears sufficient that the

claimant attach the writings that give rise to the legal entitlement to the claim (the note and

mortgage), rather than the documents that constitute additional, supporting evidence.  Accord In

re Barnes, 2008 Bankr. Lexis 1932 (Bankr. N.D. Fla. June 6, 2008).

Third, if Rule 3001(c) is construed conservatively as suggested above, it is fair to employ

an elastic approach in evaluating whether the objector has met the burden of production under

Rule 3001(f) and In re Allegheny Int'l, Inc. for overcoming the claimant's prima facie case.  After

all, the detailed evidence supporting the validity of particular charges included in a claim for

mortgage arrears (e.g., mortgage account records, invoices or canceled checks relating to escrow

deficiencies, disbursements for taxes, insurance or legal expenses) usually is within the

claimant's control.  Thus, an objector should be able to meet its burden of production and overcome the claimant's Rule 3001(f) prima facie case by either generating its own evidence directly rebutting the validity of the charges claimed <u>or</u> by demonstrating that the claimant has not responded to <u>formal or informal</u> requests for documentation or other evidence supporting the amount, reasonableness or other factors relevant to the validity of the charges at issue.  As the court stated in <u>In re Campbell</u>, 336 B.R. 430, 436 (B.A.P. 9th Cir. 2005), "a creditor's lack of adequate response to a debtor's formal or informal inquiries 'in itself may raise an evidentiary basis to object to the unsupported aspects of the claim . .  thereby coming within Section 502(b)'s grounds to disallow the claim.'"   <u>Id.</u> at 436 (quoting <u>In re Heath</u>, 331 B.R. at 437); <u>see also</u> <u>In re McKnight</u>, 2005 WL 131519, at *4 (Bankr. E.D. Pa. May 31, 2005).

## VII.  CONSIDERATION OF THE NOTE AND THE MORTGAGE

Before examining the various components of the Amended Claim for arrears in this case, applying the burden shifting rules discussed above and, ultimately, deciding whether the particular charges at issue should be allowed, I must clarify the role, if any, the Note and the Mortgage will play in the analysis.  The status of the Note and Mortgage is unclear in this case because, as explained above, the Note and Mortgage were attached to the now withdrawn Claim No. 8, but were not attached to the Amended Claim and were not introduced into evidence at the hearing.

Given the state of the record, a plausible outcome would be to deny the Amended Claim prima facie status under Rule 3001(f) because the Note and Mortgage were not attached to the claim that is the subject of the Objection and therefore, the claim was not filed in accordance with the rules, specifically Rule 3001(c).  However, considering the procedural history of this

case, I will not base my decision on such a technical application of the rules.  See generally Fed.

R. Bankr. P. 1001 (instructing courts to construe the rules to "secure the just, speedy and

inexpensive determination of every case and proceeding").  Instead, I deem the parties as having

impliedly agreed to include the Note and Mortgage that are attached to Claim No. 8 as part of the

record of this contested matter.

      Even without the Note and Mortgage having been formally introduced into evidence at

the hearing, both parties assumed that a mortgage exists and that it authorizes at least some of the

types of charges included in the itemization in the Amended Claim.  I draw this inference from

the fact that the Debtor does not dispute Aurora's secured status and does not argue that Aurora

has no entitlement to unpaid monthly instalments, late charges and various costs.  The Debtor

asserts only that the amounts claimed are either unclear, inaccurate or excessive. Thus, it appears

that the Debtor agrees that the "underlying agreement" permits Aurora to assess the Debtor for

expenses related to enforcement of the mortgage and protection of the value of the Property and

Aurora's rights in the Property.  This is the same standard as is found in the body of the

Mortgage attached to Claim No. 8.  From this, I infer that the Debtor does not dispute that the

Mortgage and the Note together constitute the "underlying agreement" between the parties within

the meaning of 11 U.S.C. §1322(e).  Further, I observe that the date of the Note and Mortgage are

consistent with the transaction date described in the Debtor's own testimony[5] and that the

Debtor's name and a signature line for him appear on the documents.  See generally Fed. R.

Evid. 901(b)(4) (authenticity of a document may be established by "appearance, contents,

substance, internal patterns, or other distinctive characteristics, taken in conjunction with

circumstances").

---

    [5]   See N.T. at 37

Accordingly, I will treat the Note and Mortgage, attached to Claim No. 8, as part of the record and I will consider their content in evaluating whether the Amended Claim is entitled to prima facie status with respect to each component of the claim, as well as whether the disputed component should be allowed.

## VIII.   ALLOWANCE AND DISALLOWANCE OF THE COMPONENTS OF THE AMENDED CLAIM FOR MORTGAGE ARREARS

### A.  Missed Monthly Payments

In the Amended Claim, Aurora asserts that the Debtor's mortgage account was nineteen (19) months delinquent, i.e., from September 2005 through March 2007, in the total amount of $7,782.78 at the time of the Debtor's bankruptcy filing.  Because the Debtor's obligation to pay monthly mortgage instalments was based on the Note and Mortgage, I am satisfied that the Amended Claim is entitled to prima facie status on this issue.  However, the Debtor presented evidence, in the form of his own testimony, to dispute the accuracy of the asserted delinquency.  As explained below, I find the Debtor's testimony sufficient to refute, at least in part, the allegations in the Amended Claim.

The Debtor testified that he returned to the United States from Guinea on February 23, 2006 and some time thereafter made a payment of $3,000.00 that Aurora retained.  See N.T. at 9-10, 17-18, 43-45.  He also testified that in September 2006, shortly before the 1st Sheriff's Sale, he sent an additional payment of $995.00 that Aurora retained.  Id. at 62-63.

I find the Debtor's statement that he made a payment of $3,000.00 shortly after returning to the United States in February 2006 to be credible.  Aurora's receipt and retention of such a payment provides a plausible explanation for Aurora's forbearance in the period between the filing of the foreclosure Complaint in January 2006 and the entry of the default judgment in June

2006. However, I do not find credible the Debtor's testimony that he made an additional payment of $995.00 in September. After describing the initial $3,000.00 payment, the balance of the Debtor's testimony regarding his efforts to negotiate a forbearance agreement with Aurora and make payments was confused and incoherent.[6] Indeed, at one point in his testimony, the Debtor stated that the $3,000.00 payment was part of a payment agreement he entered into with Aurora and that payment was only one that he made in 2006 that was not returned by his mortgage company. See id. at 17-18. Only much later in his testimony, after being prompted by his counsel on redirect did the Debtor make any reference to the additional $995.00 payment. Unlike the initial payment of $3,000.00, there is no circumstantial evidence suggesting that the later payment was made by the Debtor and retained by Aurora.

Based on these findings, I conclude that the component of the Amended Claim for nineteen (19) monthly payments totaling $7,782.78 should be allowed subject to a credit for the $3,000.00 payment the Debtor made. This results in allowance of $4,782.78 for unpaid prepetition monthly instalments.[7]

---

[6]    For example, the Debtor testified that his house was sold at sheriff's sale in March 2006. N.T. at 51. That is incorrect. Aurora had not even obtained a judgment in mortgage foreclosure until June 2006. Nor could he describe the basic terms of the forbearance agreement that he discussed with Aurora representatives prior to the entry of the foreclosure judgment. See id. at 42. Later in his testimony, he acknowledged that he was "confused." Id. at 60.

I do not mean to suggest that the Debtor purposefully misrepresented the facts. Rather, he appeared to be genuinely unable to recall the events with the degree of precision demanded for accurate answers to the questions posed to him at the hearing.

[7]    This result is consistent with the Debtor's testimony that his default arose when he left the country in September 2005. I am aware that the default could have arisen earlier and that the $3,000.00 payment could have been applied to monthly instalments that fell due prior to September 2005. I do not consider this likely, however. Because the Amended Claim says the monthly instalment was $409.62, the $3,000.00 payment represents approximately seven (7) monthly instalments. The first instalment payment under the Mortgage fell due on May 1, 2005. Between May and September 2005, only five (5) monthly instalments fell due. Thus, if the

## B.  Late Charges

In the Amended Claim, Aurora asserts an entitlement to $159.25 in late charges.  The Note provides for late charges of six percent (6%) on any overdue payment of principal and interest.  Based on the monthly payment of $409.62 set forth in the Amended Claim, the late charge computes to $24.58 per month.  Given that, even after applying the $3,000.00 credit discussed above, the Debtor was approximately twelve (12) months delinquent when this case was filed, the evidence supports a finding of unpaid late charges of $294.96.[8]  This is greater than the amount Aurora claimed.  I find that the amount claimed is consistent with Note and that the Amended Claim is prima facie valid.

The Debtor offered no evidence to refute the late charge claim and therefore, has not met his burden of production.  The Objection to this component of the Amended Claim will be overruled.

## C.  Escrow/Impound Advance

The Amended Claim includes a component for an Escrow/Impound Advance in the amount of $1,682.89.  Paragraph 2 of the Mortgage authorizes Aurora to add an escrow component to the regular monthly payment for real estate taxes and/or property insurance,

---

$3,000.00 payment were applied to the initial payments falling due under the loan, the default would run from October, not September 2005.

I also recognize the possibility that some portion of the $3,000.00 may have been applied to some other type of charge (e.g., legal expenses) and not credited against the monthly instalments.  However, Aurora did not introduce any account records to make such a showing.  In short, I find Aurora has not met its burden of proving that, after application of the $3,000.00 payment, the default date was September 2005.

[8]      12 x $24.58 = $294.96.

consistent with the provisions of the Real estate Settlement Procedures Act, 12 U.S.C. §§2601 et

seq.  Additionally, Paragraph 7, in some circumstances, authorizes Aurora to protect its lien

position by advancing sums for that purpose and making those expenditures payable on demand.

     The record does not reveal how Aurora calculated the claimed Escrow/Impound shortage.

The Debtor testified that his mortgage payment included an amount for taxes and insurance. N.T.

at 19.  Assuming that the Debtor is correct, the $1,682.89 charge may represent disbursements

Aurora made for taxes and insurance in excess of the amount of escrow payments it would have

collected had the Debtor made all of the prepetition payments as they fell due.  Or, it might

represent the difference between Aurora's disbursements and the actual amount of escrow it

collected prepetition.[9]  Or, it is possible that Aurora's escrow deficiency claim duplicates, at least

in part, the amount included in the component of the claim for prepetition monthly instalments

and should be allowed in a lesser amount.  Because there is no evidence that permits me to

answer these questions, the dispute must be decided by determining which party had the burden

of proof.    Based on Paragraphs 2 and 7 of the Mortgage, I conclude that Escrow/Impound

component of the Amended Claim is prima facie valid.  However, prior to trial, the Debtor made

a formal discovery request for "calculations" and all "documentary support in the form of a

receipt or other records" relating to the itemized components of the Amended Claim and

specifically, "any records of charges being added as an escrow deficit."  See Exhibit D-6, ¶¶ 3, 5.

Because Aurora produced no evidence of compliance with this request, see N.T. at 68, and did

not otherwise introduce evidence at trial to clarify how it calculated the asserted escrow

---

[9]    The methodology for determining the calculation of the prepetition arrearage
attributable to an escrow shortage is the subject of judicial debate.  Similarly, the proper
methodology for adjusting the mortgage instalment payments falling due postpetition due to
escrow adjustments is not settled.  Compare In re Rodriguez, 391 B.R. 723 (Bankr. D.N.J. 2008)
with In re Fitch, 390 B.R. 834 (Bankr. E.D.  La. 2008).  To resolve this contested matter, I need
not reach these issues.

deficiency,  I conclude that: (1) the Debtor met his burden of production to rebut Aurora's prima

facie case and (2) Aurora did not satisfy its burden of proof on the issue.  See In re Campbell,

336 B.R. at 436 (failure to respond to discovery can support disallowance of claim); In re

McKnight, 2005 WL 1313519, at *4 (because the calculation of an escrow shortage "can be

incomprehensible," decision on objection to claim dependent on whether the claimant "produced

its analysis to the debtor).

      For these reasons, I will disallow this component of the Amended Claim.


**D.  Property Inspections**

      The Amended Claim includes a component for property inspections in the amount of

$144.00.  Paragraph 7 of the Mortgage provides that in certain circumstances, such as a default

by the borrower, the filing of a bankruptcy proceeding or some other legal proceeding "that may

significantly affect Lender's rights in the Property, Aurora may "do and pay for whatever is

necessary to protect the value of the Property and Lender's rights in the Property."  Any

disbursements made under the authority of this provision are added to the outstanding debt and

are payable on demand.  Paragraph 7 provides illustrative examples of the kind of disbursements

encompassed by its terms:  paying liens of higher priority, paying for property repairs and paying

reasonable counsel fees.

      There may be circumstances in which obtaining an inspection of a mortgaged property is

"necessary" to protect a mortgage lender's interest in the property secured by the mortgage.  For

example, if a lender has reason to believe that a borrower has vacated or abandoned the property,

the lender may wish to take action to secure the property.  Or, if a lender has reason to believe

that a borrower is laying waste to a property, the lender may need to seek some type of

emergency judicial relief.  In situations such as these, an inspection may be needed to aid the

lender in determining whether it should take action to protect its interest in the property (and, if

so, what action to take).   At the same time, however, the mere fact that a mortgage loan is

delinquent, by itself, does not establish the necessity for property inspections at the borrower's

expense under Paragraph 7.  The core requirement in Paragraph 7 is that the expenditure must be

"necessary" to protect the lender's interest before it may be added to the indebtedness and

become payable on demand.

    In this case, because the language in Paragraph 7 is broad enough to encompass property

inspections, I conclude that the Amended Claim is entitled to prima facie status.  I reach this

conclusion notwithstanding the line of cases that suggest the property inspections are not

reimbursable expenses under a residential mortgage.  See In re Giordano, 234 B.R. 645, 651

(Bankr. E.D. Pa. 1999); In re Drake, 1992 WL 74587 (Bankr. E.D. Pa. Mar. 31, 1992); In re

Burwell, 107 B.R. 62 (Bankr. E.D. Pa. 1989).

    The most fulsome discussion of the property inspection issue in this district is found in

Burwell.  In that case, the court disallowed inspection expenses that the claimant attempted to

justify under a mortgage that provided for the mortgagee's right to "pay any other sum that is

necessary to protect the security of this instrument."  The court found that, when read properly in

context, the mortgage provision at issue did not authorize the claimant to add  such

disbursements to the mortgage debt:

> [The mortgage provision] addresses governmental fees which may encumber the
> property, and, if the mortgagor fails to pay same, gives the mortgagee a right to
> pay them and then pass these payment obligations along to the mortgagor. It is not
> addressing any sort of fees to discover or remedy conditions extant on the property
> which could deflate its value as security, which presumably the inspections are
> performed to uncover. Therefore, we believe that the mortgage here does not
> contain a specific provision authorizing inspection fees.

Burwell, 107 B.R. 66 (emphasis added).

The mortgage provision at issue in this case differs materially from the mortgage considered in Burwell.  Unlike the Burwell mortgage, the Paragraph 7 of the Mortgage authorizes the lender to enter the Property "to make repairs," and therefore, in the words of the Burwell court, encompasses expenses incurred "to remedy conditions extant on the property."  In this respect, Paragraph 7's scope exceeds that of the Burwell mortgage.  Because, as stated above, property inspections are sufficiently related to the contractual authority to protect the lender's interest in the property by making repairs, I find this category of expense to fall within the general scope of Paragraph 7.

Having concluded that, in some circumstances, the property inspection expenses are authorized by the Mortgage, I find that the charges set forth in the Amended Claim are prima facie valid under Fed. R. Bankr. P. 3001(f).  However, I also find that: (1)  the Debtor rebutted the prima facie case and (2) Aurora did not satisfy its burden of proof.

The Debtor's testimony suggests that from the period February 2006 through the filing of the bankruptcy case, he was in regular contact with Aurora in his efforts to forestall and reverse the foreclosure process.  N.T. at 9-12, 22-24, 27-30, 39-51.  The number of communications between the parties suggests that Aurora was, or should have been, aware that the Debtor was in continuous possession of the Property.  This evidence is sufficient to put the burden on Aurora to explain why the inspections were necessary and Aurora has offered no evidence on the subject.[10] The disallowance is also justified by Aurora's failure to produce in discovery or introduce into

---

[10]      It is also possible that the inspections costs were incurred before the mortgage foreclosure complaint was filed in the CP Court and while the Debtor was abroad.  However, Aurora offered no evidence pinpointing when the inspections were performed.

evidence documents responsive the Debtor's request for production of documents "showing a payment by you for each item for which you make a claim." Exhibit D-6 (Request for Production of Documents No. 5). Therefore, I will disallow the $144.00 component of the Amended Claim.

### E.  Appraisals/Preservation costs

Aurora seeks allowance of Appraisal/Preservation costs of $270.00. It is unclear what is meant by the term "Preservation" in this context, in light of the fact that immediately following this itemized component in the Amended Claim is another charge entitled "Property Preservation." Because of this overlap, I will assume that the $270.00 charge is for an appraisal.

Aurora has not elaborated on the basis for its entitlement to reimbursement of the appraisal costs. Presumably, Aurora relies upon Paragraph 7 of the Mortgage, already described above.

With respect to Paragraph 7, I find the appraisal expense comparable to the property inspection expense. Depending upon the facts of the case, an appraisal may be necessary to assist a lender in protecting the value of the lender's rights in the property. Thus, I conclude that an appraisal may be encompassed by Paragraph 7 and, therefore, that the Amended Claim is entitled to prima facie status with respect to the charge. Unlike the property inspection charge, however, I find that the Debtor did not rebut Aurora's prima facie case.

The evidence suggests that the Debtor was actively involved in attempting to work out a forbearance arrangement on a mortgage of recent vintage, the Debtor's default having arisen in approximately the middle of the first year of the repayment term. In the absence of evidence that Aurora's position was protected by an equity cushion (e.g., created by a substantial down

payment at the time of the purchase of the Property or the Property's substantial appreciation in value immediately after its purchase) – and the Debtor produced no such evidence – it was reasonable for Aurora to seek current information regarding the value of the Property to evaluate prudently the terms that it might offer in response to the Debtor's request for forbearance . Thus, the evidence permits the inference that it was not merely mortgage default itself, but rather the Debtor's active solicitation of a forbearance agreement that may have necessitated the appraisal.[11] For these reasons, on this record, I find that the Debtor raised no factual issues to suggest that it was either unreasonable, inappropriate or unnecessary for Aurora to obtain an appraisal.  The Debtor did not overcome the prima facie effect of the Amended Claim and I will allow the $270.00 appraisal expense.


**F. Property Preservation**

The Amended Claim includes a component for Property Preservation costs in the amount of $194.28.

Based on the Debtor's testimony regarding his ongoing communications with Aurora, see Part VIII.D, supra, as well as Aurora's failure to respond to the Debtor's discovery request for evidence justifying and documenting these charges, see Part VIII.C., supra,  I conclude that the Debtor rebutted Aurora's prima facie case based on the Amended Claim.  Aurora did not present any evidence regard the precise nature of the charges falling under this category or why it was necessary for Aurora to incur these expenses.  Therefore, I find that Aurora has not met its burden of proof on the issue.  The result is that this charge should be disallowed.

---

[11]      Neither party presented any evidence regarding the date that Aurora requested the appraisal.  Had the Debtor demonstrated that the appraisal preceded the parties' forbearance negotiations, perhaps he would have met his burden of production and overcome the prima facie validity of the Claim.

## G.  Foreclosure Attorney's Fees

The Amended Claim requests allowance of Foreclosure Attorney's Fees of $1,550.00.
Paragraph 18 of the Mortgage permits Aurora to charge the Debtor for its reasonable attorney's
fees incurred in enforcing the Mortgage.[12]

Based on the rationale employed in prior reported decisions in this district involving
challenges to requests for the allowance of counsel fees that are unsupported by time records, and
applying a lodestar analysis, I will reduce the allowance for foreclosure attorney's fees to
$1,000.00 as follows:  $700.00 for obtaining a default judgment in the CP Court, plus an
additional $300.00 for the amending the judgment.  See In re Sims, 358 B.R. at 228 (Bankr. E.D.
Pa. 2006) (citing In re Gordon-Brown, 340 B.R. 751 (Bankr. E.D. Pa. 2006)).

## H.  Foreclosure Costs

### 1.

The Mortgage obligates the Debtor to reimburse Aurora for all expenses incurred in
enforcing the Mortgage.  See n.12, supra.

At trial, Aurora presented three (3) exhibits on the issue of foreclosure costs:

- Exhibit R-2 is a breakdown of all costs related to the 1st Sheriff's sale

- Exhibit R-3 is a breakdown of all costs associated with the 2nd Sheriff's sale

- Exhibit R-4 includes invoices from their attorney for all fees and costs
  incurred on the case (in effect providing a compilation of Exhibits R-3 and R-
  4)

---

[12]      Paragraph 18 of Mortgage provides, in pertinent part, that to reinstate Mortgage
following a default, the Debtor must pay "all expenses incurred in enforcing this Security
Agreement, including, but not limited to, reasonable attorney's fees."

The Exhibits are not entirely consistent with the Amended Claim.  Exhibit R-4 sets forth costs totaling $8,904.95.  At the hearing on the Objection, Aurora deducted $130.50 from Exhibit R-4[13] leaving a revised total of $8,774.45, well over the $7,580.49 set forth in the Amended Claim.[14]

Based on Exhibit R-4, the $8,774.45 in costs claimed by Aurora may be organized, roughly chronologically, as follows:

### foreclosure expenses prior to entry of judgment

| | |
|---|---|
| title search | $  325.00 |
| sheriff service costs | 285.00 |
| prothonotary | 219.50 |
| prothonotary | 30.00 |
| sheriff's service costs | 370.00 |
| **Sub-total** | **$1,229.50** |

See Exhibit R-4 (invoices dated 1/25/06 and 3/29/06).

### foreclosure expenses related to the 1st Sheriff's Sale

| | |
|---|---|
| refund to SPS | $  494.50 |
| 3129 Certification | 125.00 |
| sheriff's deposit | 4,280.45[15] |

---

13    The deduction was an entry dated February 21, 2006 relating to the Recorder of Deeds (N.T. at 86-87).

14    Aurora provided no explanation for the variance between the Amended Claim and the trial exhibits.

15    Exhibit R-2 further breaks down the sheriff's deposit for the 1st Sheriff's Sale as follows:

| | |
|---|---|
| water rents | $  777.57 |
| City transfer tax | 984.48 |
| record deed | 156.50 |
| acknowledge deed | 4.00 |
| commission | 500.00 |
| PGW | 4.52 |
| location | 7.41 |
| search | 250.00 |

| | |
|---|---|
| **sheriff - service costs** | **120.00** |
| **continuation search** | **140.00** |
| **Sub-total** | **$5,159.95** |

<u>See</u> Exhibit R-4 (invoice dated 10/4/06).

**foreclosure expenses related to the 2nd Sheriff's Sale**

| | |
|---|---|
| **3129 certification** | **$  125.00** |
| **sheriff deposit** | **2,000.00** |
| **sheriff - service costs** | **120.00** |
| **title continuation search** | **140.00** |
| **Sub-total** | **$2,385.00** |

<u>See</u> Exhibit R-4 (invoice dated 3/6/07).

**2.**

Initially, I observe that the Debtor has put forward no evidence challenging Aurora's entitlement to the itemized expenses that preceded the entry of the foreclosure judgment. Therefore, I will allow the "foreclosure expenses prior to entry of judgment" in full as requested in the Amended Claim (<u>i.e.</u>, $1,229.50).

---

| | |
|---|---|
| advertising | 863.38 |
| writ/rec proc | 55.09 |
| conduct/proc | 200.00 |
| RDAI | 37.50 |
| deed prep | 85.00 |
| distribution policy | 355.00 |
| **Total   $4,280.45** | |

**3.**

The Debtor argues that the "foreclosure expenses related to the 1st Sheriff's Sale" should

not be allowed because that sale was set aside by the CP Court.[16]  I agree, but only in part.  As

explained below, I conclude that Aurora is not entitled to reimbursement of those expenses it

incurred after "the hammer fell" at the sheriff's sale that constitute transaction fees and costs

imposed by the sheriff for completing the sheriff's sale and title transfer process, but that Aurora

is entitled to reimbursement of the amount paid in satisfaction of outstanding municipal claims

that encumbered the Property

Pa. R. Civ. P. 3135(a) provides:

> When real property is sold in execution <u>and no petition to set aside the sale has been
> filed</u>, the sheriff, <u>at the expiration of twenty days after either the filing of the schedule
> of distribution or the execution sale if no schedule of distribution need be filed</u>, shall
> execute and acknowledge before the prothonotary a deed to the property sold. The
> sheriff shall forthwith deliver the deed to the appropriate officers for recording and for
> registry if required. Confirmation of the sale by the court shall not be required.

<u>Id.</u> (emphasis added).

On its face, Rule 3135(a) suggests that the sheriff should deliver a deed after the requisite

twenty (20) day period only if "no petition to set aside the sale has been filed."  Read literally, the

rule appears to create the equivalent of an "automatic stay" of the delivery of the sheriff's deed if

the judgment debtor files a timely petition to set aside the sale.  I need not determine whether that

is the meaning of the rule.  For purposes of resolving the Objection, all that matters is whether

the costs relating to the completion of the sheriff's sale are reasonable and therefore,

reimbursable to Aurora by the Debtor under the Mortgage.

Whatever Rule 3135(a) might mean, I find that some of the costs as to which Aurora

---

[16]        The Debtor's evidence that the CP Court set aside the 1st Sheriff's Sale served to
satisfy his burden of production and overcome Aurora's prima facie case with respect to the costs
it incurred after the date of the sale.

seeks reimbursement were not reasonable.  If Rule 3135(a) imposed a "stay," the costs should not have been incurred and are not reasonable.  <u>See</u> <u>generally</u> <u>In re Pitts</u> 354 B.R. 58, 67 (Bankr. E.D. Pa. 2006) (attorney's fees incurred in violation of bankruptcy automatic stay under 11 U.S.C. §362(a) held not reasonable or reimbursable under Pennsylvania residential mortgage).  If Rule 3135(a) did not impose a stay, Aurora had the ability to avoid incurring unnecessary costs by: (1) checking the court record to determine if the Debtor had filed a timely petition to set aside the sheriff's sale ( as, in fact, the Debtor did in this case) before making the expenditures required to obtain the sheriff's deed and (2) waiting for the expiration of the twenty (20) day period Rule 3135(a).   Having chosen to proceed before the sheriff's sale was "final" under Rule 3135(a), Aurora is the party that should bear the financial risk that the sale would be set aside by the CP Court.  It would be inequitable and unreasonable to permit Aurora to pass all of the costs associated with completion of the sale to the Debtor.

   The costs that Aurora paid to obtain the sheriff's deed before the CP Court set aside the sale fall into two (2) broad categories.  Some of the costs might be characterized as pure transactional costs in the form of fees payable to the sheriff to effectuate the transfer of title (e.g., sheriff's commission).  Other costs were paid on account of outstanding municipal claims, including first liens against the Property for unpaid municipal services (e.g., water rents, PGW). <u>See</u> 53 P.S. §7106(a).

   I will disallow what I have characterized as the "transaction fees" paid to the sheriff, but I will allow the disbursements Aurora made to pay off outstanding municipal liens.  Not only did Aurora's payment of the municipal liens provide a benefit to the Debtor (the satisfaction of debts owed by the Debtor to a third party), but also, Aurora's disbursements for that purpose are reimbursable under Paragraph 7 of the Mortgage.  By comparison, the "transaction fees" incurred

after the sheriff's sale (payment of which, as stated above, Aurora could have avoided), provided no benefit to the Debtor.

For these reasons, I will disallow the following foreclosure costs set forth in Exhibit R-2 that appear to be related to the transfer of title following the 1st Sheriff's Sale:

| | | |
|---|---|---|
| City transfer tax | $ | 984.48 |
| record deed | | 156.50 |
| acknowledge deed | | 4.00 |
| commission | | 500.00 |
| deed prep | | 85.00 |
| distribution policy | | 355.00 |
| | **Sub-total** | **$2,084.98** |

In addition, for different reasons, I will disallow the following, other costs allegedly incurred in connection with the 1st Sheriff's Sale:

| | | |
|---|---|---|
| location | $ | 7.41 |
| writ/rec proc | | 55.09 |
| conduct/proc | | 200.00 |
| RDAI | | 37.50 |
| | **Sub-total** | **$ 300.00** |

The meaning of these costs is unclear. Due to the lack of clarity, I cannot ascertain if they are encompassed by Paragraph 18 of the Mortgage. Further, I cannot determine whether they were reasonable or necessary. Also, even if these types of expenses (whatever they may be) are generally reasonable and necessary in the foreclosure process, I cannot determine in this case if they were incurred as transaction costs in connection with the delivery of the Sheriff's deed and therefore, should be disallowed for the reasons discussed above. Based on their uncertain meaning and the possibility that they were incurred after the sheriff's sale, I find that Aurora did not meet its burden of proving its entitlement to the allowance of these charges.

**4.**

Turning to the 2nd Sheriff's Sale, the expenses for that sale are set forth in two Exhibits. Exhibit R-4 (specifically, the March 6, 2007 attorney invoice included in the Exhibit) sets out the amount disbursed by Aurora in connection with the 2nd Sheriff's Sale. Exhibit R-3 then provides a detail of those disbursements.

Exhibit R-3 is inconsistent with Exhibit R-4. Exhibit R-3 lists a total disbursement of $2,385.00. Of that amount, $2,000.00 represented the deposit Aurora paid to schedule the 2nd Sheriff's Sale. However, Exhibit R-3 indicates that the Sheriff's deposit was $1,700.00, not $2,000.00, and that the Sheriff has refunded to $640.71 to Aurora, leaving a net expense of $1,059.29. This discrepancy mandates a reduction of $940.71 from the $2,385.00 claimed in Exhibit R-3 for the 2nd Sheriff' Sale. The results is a net allowable amount of $1,444.29.[17] I will allow $1,444.29 of the expenses incurred in connection with the 2nd Sheriff's Sale.

**5.**

The three (3) reductions described above in Parts VIII.H.3. and 4. total $3,325.69:

- $2,084.98 for certain sheriff's expenses incurred after the 1st Sheriff's Sale, see Part VIII.H.3., supra;

- $300.00 for indeterminate expenses incurred in connection with the 1st Sheriff's Sale, id.;and

- $940.71 in connection with the 2nd Sheriff's Sale, Part VIII.H.4, supra.

Subtraction of $3,325.69 from the $8,774.45 in costs claimed in Exhibit R-4 leaves $5,448.76. Therefore, I will allow $5,448.76 in foreclosure costs as a component of the

---

[17]     The Debtor acknowledges that costs paid to the sheriff to schedule the 2nd Sheriff's Sale are "legitimate." See N.T. at 90-92. I agree.

Amended Claim for prepetition mortgage arrears.  This constitutes a reduction of $2,131.73 from the $7,580.49 originally claimed in the Amended Claim.

## I.  Compilation

The table set forth below summarizes the allowances and disallowances I have made to Aurora's Amended Claim for mortgage arrears:

| Component of Claim | Amount in Aurora's Amended Claim | Reduction | Allowed Amount |
|---|---|---|---|
| 19 Monthly Payments | 7,782.78 | 3,000.00 | 4,782.78 |
| Late charges | 159.25 | 0.00 | 159.25 |
| Escrow/Impound Advance | 1,682.89 | 1,682.89 | 0.00 |
| Property Inspections | 144.00 | 144.00 | 0.00 |
| Appraisals/Preservation | 270.00 | 0.00 | 270.00 |
| Property Preservation | 194.28 | 194.28 | 0.00 |
| Foreclosure Attorney Fees | 1,550.00 | 550.00 | 1,000.00 |
| Foreclosure Attorney Costs | 7,580.49 | 2,131.73 | 5,448.76 |
| | | | |
| **TOTAL** | **19,363.69** | **7,702.90** | **11,660.79** |

## IX.  CONCLUSION

For the reasons set forth above, I will sustain in part the Objection to the Amended Claim.

Aurora's claim for prepetition mortgage arrears will be allowed in the amount of $11,660.79.  An

Order consistent with the Memorandum Opinion will be entered.

Date:  September 17, 2008

_____
ERIC L. FRANK
U.S. BANKRUPTCY JUDGE